Jay D. Weiner (OSBA No. 182247)
Rosette, LLP
1415 L St. Suite 450
Sacramento, California 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
jweiner@rosettelaw.com

*Attorney for Plaintiff*
*The Klamath Tribes*

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| THE KLAMATH TRIBES, a federally recognized Indian Tribe, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES BUREAU OF RECLAMATION, <br><br> and <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

The Klamath Tribes ("Tribes") bring this Complaint and allege the following:

### **INTRODUCTION**

1.      The C'waam (Lost River sucker, *Deltistes luxatus*) and Koptu (shortnose sucker, *Chasmistes brevirostris*) – two treaty-protected fish of existential importance to the Tribes – are facing extinction. After bountifully sustaining the Tribes' material and spiritual needs for

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

millennia, the populations of these fish have dwindled precipitously since intensive agriculture arrived in the Klamath Basin in the late 19th Century. Listed as endangered species under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA"), since 1988, fewer than 3,500 adult Koptu now remain in existence on the face of the planet alongside fewer than 27,000 adult C'waam. There has been no appreciable "recruitment" – that is the growth of young fish to reproductive maturity – of either C'waam or Koptu since the early 1990s, and these adults are rapidly approaching the end of their expected life span. If the Tribes are to have any hope of preventing the extinction of these two species, then it is essential there are still existing adult fish to spawn and rear.

2.      Upper Klamath Lake ("UKL") is the most critical habitat for C'waam and Koptu, as it is where the vast majority of the surviving adults spend most of their lives and where each year's new class of baby fish must try to survive. UKL is also managed by the Bureau of Reclamation ("Reclamation") as the primary source of supply for the Klamath Irrigation Project ("Project"). The Klamath Basin is experiencing its third straight year of intense drought, meaning that there is once again not enough water in UKL to allow Reclamation to simultaneously meet the needs of the C'waam and Koptu and Project irrigators.

3.      In 2020, Reclamation consulted with the U.S. Fish and Wildlife Service ("USFWS") under Section 7 of the ESA on its proposed action ("PA") for operating the Project from 2020 through 2022. Ahead of that consultation, Reclamation prepared a biological assessment ("2020 BA") concerning the PA, including its proposed method for allocating available water during the spring/summer portion of the year among Project irrigators, C'waam and Koptu, and listed species in the lower Klamath Basin. At the conclusion of the consultation, USFWS issued a biological opinion ("2020 BiOp") concluding that the PA would not jeopardize the

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

C'waam and Koptu or adversely modify their critical habitat.[1] This conclusion was predicated on Reclamation's PA, including its water allocation formula. Reclamation's response to this year's poor hydrology, however, has been in direct contravention of that formula.

4.      In its Operations Plan for the 2022 spring/summer period ("2022 Ops Plan"), Reclamation baldly disclaims any effort to meet the spring and summer requirements for UKL elevations set forth in the 2020 BiOp. Instead, Reclamation began allocating water to Project irrigators on April 15, 2022, smack in the middle of C'waam and Koptu spawning season and directly at the expense of the species' essential biological needs. This arbitrary and capricious decision cut off an important cohort of C'waam who spawn on the east side of UKL from virtually all their spawning grounds, and will leave functionally no rearing habitat available in UKL this spring and summer for larvae and juvenile C'waam and Koptu, whether spawned in UKL or its tributaries. The net effect of the 2022 Ops Plan, therefore, is to consign to death 2022's entire year class of baby C'waam and Koptu. This decision appreciably reduces the survival and recovery of these species in contravention of the ESA, which requires Reclamation to prioritize listed species' needs ahead of those of Project irrigators when there is insufficient water to go around.

5.      Reclamation engaged in a meet-and-confer process with USFWS prior to adopting the 2022 Ops Plan. USFWS identified a number of risks to the C'waam and Koptu posed by the 2022 Ops Plan. Despite those risks – and despite the water management choices contemplated by the 2022 Ops Plan violating the terms of Reclamation's own PA and the 2020 BA, and falling

---

[1] The Tribes dispute the accuracy of the 2020 BiOp's no-jeopardy finding, and nothing herein should be construed to waive any claim the Tribes might have in regard to that conclusion or related to the compliance (or lack thereof) of the 2020 BiOp with the mandates of the ESA, including the sufficiency of any minimum boundary conditions set by the 2020 BiOp to preserve basic life cycle needs of the C'waam and Koptu. The Tribes rely on those boundary conditions here because they are the irreducible minimum conditions USFWS set for Reclamation's operation of the Project and reflect USFWS' interpretation of Reclamation's obligations under the ESA.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

outside the scope of the 2020 BiOp's effects analysis – USFWS did not rescind or even modify the Incidental Take Statement ("ITS") it had issued Reclamation in the 2020 BiOp. The ITS purports to immunize Reclamation from liability for incidentally "taking" C'waam and Koptu in connection with operating the Project. USFWS' arbitrary and capricious accession to Reclamation's decision to implement the 2022 Ops Plan violates Section 7 of the ESA and is redressable under the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* ("APA").

6.      The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA") requires federal agencies to take a hard look at the potential effects of their proposed actions. Reclamation's slipshod effort at a "Determination of [NEPA] Adequacy" ("DNA") in connection with its issuance of the 2022 Ops Plan elides the manner in which that plan fundamentally departs from the PA's water allocation formula and fails to analyze the detrimental effects that such a choice will have on C'waam and Koptu this year. This violates NEPA.

7.      The Tribes are therefore left with no choice but to file this suit against Reclamation and USFWS to remedy these illegal actions in an effort to save the C'waam and Koptu from extinction. This suit seeks several things. The Tribes seek declaratory and injunctive relief to remedy Reclamation's adoption of a 2022 Ops Plan that is contrary to the conditions of the 2020 BiOp's ITS, which means Reclamation is committing unpermitted take of C'waam and Koptu in violation of the ESA by authorizing Project irrigators to begin using water diverted or released from UKL on April 15, 2022. The Tribes seek injunctive relief to remedy USFWS' failure to rescind the 2020 BiOp's ITS because of the 2022 Ops Plan's radical departure from the PA, as USFWS' decision was arbitrary and capricious, an abuse of discretion, and not in accordance with law pursuant to the APA. And the Tribes seek declaratory and injunctive relief to remedy the fact that Reclamation's DNA issued in conjunction with the 2022 Ops Plan is inadequate to legally

satisfy Reclamation's NEPA obligations.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

8.      The District Court has jurisdiction over this matter under 5 U.S.C. §§ 701-706, and 28 U.S.C. §§ 1331 & 1362.

9.      Venue is proper in the District of Oregon under 28 U.S.C. § 1391(e) because the Tribes and Defendants reside there.

10.     Divisional venue is proper in the Medford Division pursuant to L.R. 3-2(a) & (b) because the Tribes and Defendants reside there and a substantial part of the events and omissions giving rise to the Tribes' claims occurred there.

## PARTIES

11.     Plaintiff Klamath Tribes are a federally recognized Indian tribe possessing governmental authority over their members and Indian lands and consist of three peoples who traditionally inhabited lands that now comprise parts of Southern Oregon and Northern California: the Klamath, the Modoc, and the Yahooskin Band of Snake Indians. See 87 Fed. Reg. 4636, 4638 (Jan. 28, 2022). The Tribes' headquarters are in Chiloquin, Oregon, in the heart of the Upper Klamath Basin.

12.     Since time immemorial, the Tribes' members have used the resources of the Klamath Basin for subsistence, cultural, ceremonial, religious, and commercial purposes. The Tribes possess federally reserved water rights to Klamath Basin water for, among other purposes, the preservation, protection, and exercise of their treaty-guaranteed rights to hunt, fish, trap, and gather. Indeed, one of the "very purposes of establishing the Klamath Reservation was to secure to the Tribe[s] a continuation of [their] traditional hunting and fishing lifestyle." *United States v. Adair*, 723 F.2d 1394, 1409 (9th Cir. 1983) (internal quotation marks omitted). These treaty rights

survived the termination of the Tribes' former reservation. *Kimball v. Callahan*, 493 F.2d 564, 569 (9th Cir. 1974).

13.     C'waam and Koptu, freshwater fish species native to lakes and rivers of the Upper Klamath Basin, have sustained the Klamath Tribes' members since time immemorial and continue to play a central role in the Tribes' culture and spiritual practices. They are essential to the way of life of the Tribes' members, and the Tribes have a fundamental responsibility to protect them. Once one of the most important food-fish in the Upper Klamath Lake region, C'waam and Koptu were caught by the thousands as a mainstay of the Klamath Tribes' diet. Yet these species are now in an extremely precarious condition and at imminent risk of extinction, potentially from just a single catastrophic event. Recognizing their precipitously declining numbers, the Tribes suspended fishing for C'waam and Koptu in 1986 and redoubled their efforts to ensure the conservation and recovery of these important species. In 1988, USFWS listed both species as endangered under the ESA, and designated UKL and its environs as their critical habitat in 2012. The Tribes now limit themselves to catching and releasing just two fish every year for ceremonial purposes, and a second generation of Tribal members is growing up knowing C'waam and Koptu only through these annual ceremonies and the stories told by their elders and not through their own experience of harvesting, preparing, sharing, and consuming these vital components of their cultural and spiritual existence.

14.     Defendant Reclamation is a federal agency within the Department of the Interior that constructs and operates federal water projects throughout the western United States. Reclamation has primary management authority over the Project. Reclamation also has a trust responsibility to protect the Tribes' treaty resources, including the C'waam and Koptu.

15.     Defendant USFWS is a federal agency within the Department of Interior whose

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

primary responsibility is the conservation and management of fish, wildlife, plants, and their habitats. USFWS is charged with administering the ESA as it relates to the C'waam and Koptu. *See* 16 U.S.C. § 1636(a)(2). USFWS has a trust responsibility to protect the Tribes' treaty resources, including the C'waam and Koptu.

## THE ENDANGERED SPECIES ACT

16.    Section 7 of the ESA forbids federal agency "action" that may "jeopardize the continued existence" of a listed species or destroy or adversely modify a species' critical habitat. 16 U.S.C. § 1536(a)(2). An "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. To "jeopardize the continued existence" of a listed species is "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) ("[T]he jeopardy regulation requires [the consulting agency] to consider both recovery and survival impacts."). The "destruction or adverse modification of critical habitat" is defined as:

> a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02; *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004). An agency's obligations under Section 7 extend to any ongoing action over which the agency retains authority or discretionary control.

17.    Section 7 of the ESA also establishes an interagency consultation process to assist federal agencies in complying with their ESA obligations to avoid jeopardy or the adverse

modification of critical habitat. Under this Section 7 process, a federal agency proposing an action that "may affect" a listed species such as the C'waam and the Koptu must prepare and provide the expert agency, USFWS in this case, a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(c); 50 C.F.R. § 402.12. The expert agency is then responsible for reviewing all relevant information provided by the action agency, assessing the "effects of the action" together with "cumulative effects" on listed species and critical habitat. 50 C.F.R. § 402.14(g)(3)–(4). This determination is rendered in a biological opinion. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h).

18.    Section 9 of the ESA bars the "take" of endangered species by any person, including federal agencies. 16 U.S.C. § 1538(a)(1). To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). USFWS has defined "harm" within the meaning of "take" to include "an act which actually kills or injures wildlife… [including] significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. USFWS has extended this take prohibition to C'waam and Koptu by virtue of listing them as endangered species. 53 Fed. Reg. 27130 (July 18, 1988).

19.    If a federal action subject to consultation will result in the take of a listed species, the associated biological opinion must include an "incidental take statement" that specifies the amount and extent of incidental take of listed species allowed as a result of the proposed action as well as the "terms and conditions" under which such incidental take is authorized. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The action agency must comply with the terms and conditions of the ITS. 50 C.F.R. § 402.14(i)(1)(iv). Compliance with a valid ITS shields the actor from take liability for activities undertaken in compliance with the ITS' terms and conditions. 16 U.S.C. §

1536(o)(2); *see* 16 U.S.C. § 1536(b)(4)(C). But the ITS also acts as a crucial check on the assumptions and conclusions of a biological opinion, as take exceeding the thresholds set forth in an ITS is not protected from liability. *See Bennett v. Spear*, 520 U.S. 154, 170 (1997). Non-compliance with the terms and conditions of an ITS may also deprive the action agency of the ability to avoid take liability under the ITS' safe harbor. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1249 (9th Cir. 2001).

## THE ADMINISTRATIVE PROCEDURE ACT

20.    The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court" by persons "aggrieved" by such action. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## THE NATIONAL ENVIRONMENTAL POLICY ACT

21.    NEPA requires that federal agencies publish an environmental assessment ("EA") or environmental impact statement ("EIS") before taking a "major federal action" that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). The environmental compliance document ("NEPA analysis") must contain a detailed statement of (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id*.

22.    The purpose of an EA is to allow the action agency to make a reasoned

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

determination of whether an EIS is necessary. 43 C.F.R. § 46.300. If the action agency determines that an EIS is not required and intends to proceed with the proposed action, it must publish a Finding of No Significant Impact ("FONSI"). 43 C.F.R. § 46.325.

23.      Under Interior Department regulations, Reclamation may utilize an existing NEPA analysis for a new proposed action. 43 C.F.R. § 46.120. It may do so, however, only if it "determines, with appropriate supporting documentation, that [the existing NEPA analysis] adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c). Prior to relying on existing NEPA documentation, Reclamation must evaluate "whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.*

## GENERAL ALLEGATIONS

### A.      Historical Background

24.      In 1864 the Tribes and the United States entered into the Treaty between the United States of America and Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, October 14, 1864, 16 Stat. 707 ("1864 Treaty"). Under the 1864 Treaty, the Tribes relinquished their right to occupy 20 million acres of what had been their traditional homeland, but reserved for themselves 2.5 million acres of land, encompassing the entire Upper Klamath River Basin above Upper Klamath Lake. By 1954, however, fraudulent land surveys and disastrous and dishonorable federal Indian polices reduced the Klamath Indian Reservation to 1.2 million acres, of which 882,000 were Tribal trust lands. In 1954, Congress terminated the Tribes, ending their federal recognition and depriving them of their remaining land base, much of which is now part of the Fremont-Winema National Forest. Recognizing the grievousness of this decision, Congress restored the Tribes to federal recognition in 1986, though without returning their land base. The

Tribes' treaty-protected rights to hunt, fish, trap, and gather, however, survived termination. *See Kimball v. Callahan*, 590 F.2d 768, 775 (9th Cir. 1979).

25.     Pursuant to the Act of February 9, 1905, ch. 567, 33 Stat. 714, and under the authority of the Reclamation Act of 1902, 43 U.S.C. §§ 372, *et seq.*, Congress authorized the construction and development of the Project. The bulk of the Project's facilities were constructed between 1906 and 1966. The Project consists of several major dams, including the Link River Dam at the outlet of UKL, and multiple canals and pumping stations. The Project's infrastructure and operations have substantially modified the hydrology of the Klamath River Basin in order to store, divert, and convey water for agricultural, municipal, and hydroelectric uses throughout what is now southern Oregon and northern California. The Project provides irrigation water annually to roughly 200,000 acres of irrigated lands, as well as water to the four federal wildlife refuges located within its service area.

26.     UKL, the largest freshwater lake in Oregon and one of the largest in the west, is roughly 25 miles long and up to 12.5 miles wide, with a surface area of 91,260 acres. It is fed by water from the Sprague, Williamson and Wood Rivers and their tributaries, as well as natural springs. UKL and its tributaries comprise the most important habitat for the continued existence of the C'waam and Koptu. UKL is especially critical to the conservation and recovery of the C'waam and Koptu because it provides the most habitat and has the greatest variety of spawning sites. It is also home to the last genetically intact reproducing population of Koptu in existence anywhere in the world.

27.     Reclamation controls the elevation of UKL through oversight of the operation of the Link River Dam, located on the Lake's southern end. While UKL is the primary source of water supply for the Project, it is not an artificial reservoir like those constructed by Reclamation

for other irrigation projects in the West and Reclamation did not increase the amount of storage space in UKL to meet the needs of the Project. Rather, in 1921 Reclamation dredged the natural reef that formed a barrier between UKL and the Link River and constructed Link River Dam which now allows Reclamation to drain UKL approximately three to five feet lower than it could drop naturally. Thus, when Reclamation releases water from UKL to the Project, it is using water that would have been available to sustain fish, had the natural stability of lake levels not been unnaturally degraded by Reclamation's construction and operation of the Project.

28.    Before construction of the Link River Dam in 1921, UKL elevations varied between roughly 4,140 and 4,143 feet above sea level ("ft"), with a mean annual variation of approximately two feet. Since construction, however, UKL elevations have varied annually over a range of approximately seven feet, from 4,136 to 4,143 ft. These substantial drops in UKL elevation levels deprive C'waam and Koptu of habitat and adequate spawning environments, and expose them to increased risk of predation and the effects of poor water quality. Since the inception of the Project, C'waam and Koptu populations have plummeted as a direct result of Reclamation's management of UKL at elevation levels beneath those necessary to support essential C'waam and Koptu biological functions such as spawning, rearing, feeding, sheltering, and migration.

B.    The C'waam and Koptu Are Being Driven Relentlessly Toward Extinction

29.    Between 1968 and 1985, C'waam and Koptu harvests decreased from over 10,000 fish per year to just 687. Recognizing the peril facing these essential cultural and treaty resources, and in an effort to protect them from extinction, the Klamath Tribes voluntarily suspended fishing for C'waam and Koptu in 1986 in order to focus on their conservation and recovery.

30.    USFWS listed the C'waam and Koptu as endangered species throughout their entire range in 1988. 53 Fed. Reg. 27,130 (July 18, 1988). In 2012, USFWS designated UKL and its

tributaries as critical habitat for the C'waam and Koptu. 77 Fed. Reg. 73,740 (Dec. 11, 2012).

31.     Despite a brief recovery period in the late 1980s and early 1990s, both the C'waam and Koptu have continued on their longer-term spiral toward extinction. There has not been substantial recruitment of new juveniles into the spawning C'waam population for 30 years, and into the Koptu population for 23 years. There are currently not enough younger fish to assure the continued existence of the species after the death of the current generation of adults. And those adults are aging, and are at ever increasing risk of becoming incapable of successful spawning as they senesce. Most of the adult C'waam are estimated to be approximately 30 years old, past their average life span of 17-22 years, and nearing their maximum observed lifespan of 40 years. Most of the individual Koptu are estimated to be in their late 20s as well, perhaps more than double the Koptu's average lifespan of 12-14 years, and nearing the oldest ages ever recorded for members of that species.

32.     Moreover, a 2017 die-off event compounded by subsequent annual mortality has reduced the number of surviving adults of both species by roughly 75% in the past six years alone. In 2016, there were approximately 108,000 C'waam and 19,000 Koptu adults in UKL. By 2019, population estimates were approximately 40,000 C'waam and 7,000 Koptu. And currently there are only approximately 4,100 UKL spawning C'waam adults (comprised of an estimated 2,750 females and 1,250 males) and approximately 22,000 river spawning C'waam adults (comprised of an estimated 13,000 females and 9,000 males) left in existence. The Koptu population numbers are even more alarming, with only approximately 3,350 remaining adults (comprised of an estimated 2,100 females and 1,350 males) in UKL.

33.     The fish are thus facing two simultaneous and reinforcing crises: baby C'waam and Koptu are not surviving long enough to be recruited into the adult population, and the surviving

adults are coming closer and closer to the inevitable ends of their lives. Consequently, the continued survival of the species is dependent on: 1) maximizing the opportunities for annual spawning; 2) ensuring sufficient rearing habitat in UKL for the larval and juvenile fish to have a chance of surviving long enough to join the adult population; and 3) giving the remaining adults the best possible opportunity to survive to spawn another year. Reclamation's water management decisions for UKL critically affect all three of these factors.

34.     The majority of UKL-resident C'waam and all of the UKL-resident Koptu swim up into the Williamson River to spawn, and UKL elevations do not directly affect spawning conditions there. There is, however, an important cohort of C'waam that spawns along the east shore of UKL where four springs flow in. For this cohort, which had a comparatively *high* rate of survival after the 2017 die-off as compared to Williamson River spawners (suggesting that this UKL-spawning population may have unique characteristics important to the long-term viability and vitality of the species), the amount of available spawning habitat is directly influenced by UKL elevations. These C'waam need graveled habitat covered in at least a foot of water to be able to successfully lay eggs that can survive to hatching. Consequently, in the 2020 BiOp, USFWS established a minimum elevation requirement for UKL during the April and May spawning season of 4,142.0 ft. At that elevation, USFWS determined, there would be enough habitat available to avoid compromising the spawning process. 2020 BiOp at § 7.3.1.1. Were UKL elevations to drop below that level, however, and particularly were they to decrease further and further below an elevation of 4141.4 ft, USFWS anticipated there would be progressively worsening impacts on both the amount of time the fish would spend on these spawning beds and on the number of fish who would even attempt to spawn in the first place. *Id.*

35.     Yet 2022 now marks the third consecutive year that poor hydrology compounded

by Reclamation's operational decisions have dropped UKL below an elevation of 4,141.4 ft during this crucial spawning period. Indeed, UKL elevation this spring was never even allowed to *reach* 4,141.4 ft. And C'waam detection data reveals that USFWS' assessment that lowered water elevations would worsen spawning outcomes was correct. In 2010, when UKL's elevation during spawning season topped out at 4,141.3 ft, a U.S. Geological Survey study (cited by USFWS in the 2020 BiOp) concluded that, at that year's elevations, there was a 14% reduction in the number of female C'waam coming to the spawning sites and, among those who did show up, a 36% reduction in the time they spent on spawning grounds, causing those prospective spawners to deposit eggs in fewer locations.[2] 2020 BiOp at §7.3.1.1. This year, Reclamation has already dropped UKL lower than it did in 2010, and with the surviving 2010 fish now being over a decade older, very few UKL-spawning C'waam are even attempting to reach their spawning grounds at all.

36.    But even had robust UKL spawning occurred this year, the 2022 Ops Plan would nonetheless kill off these baby fish – along with their Williamson River-spawned compatriots – because of Reclamation's approach to mid-summer UKL elevations. As C'waam and Koptu young move through their life cycle from larvae to juveniles, which typically occurs between April and the middle of July, they need nursery habitat (emergent wetlands) that offers sufficient food and protection from predators (as well as from the effects of wind, waves, and currents in UKL that can be similarly lethal to exposed fish). The availability of this habitat depends entirely on UKL

---

[2] Recognizing the deleterious effects 2010 wrought had on C'waam and Koptu spawning, USFWS adopted in the 2020 BiOp the daily elevations observed in April and May of that year as an independent boundary condition to provide a secondary floor beneath the requirement of 4,142.0 feet. 2020 BiOp at §11.3.2 (T&C 1c). In the 2022 Ops Plan, Reclamation entirely ignores this requirement. Ironically, USFWS does the same in its April 11, 2022, Response Memorandum to Reclamation regarding the 2022 Ops Plan. *See* U.S. Dep't of the Interior, Fish and Wildlife Service, Mem. from J. Marek, Field Supervisor, Klamath Falls Fish and Wildlife Office to Area Manager, Bureau of Reclamation Area Officer (Apr. 11, 2022) ("USFWS 2022 Ops Plan Response").

elevations. For this reason, USFWS established a minimum elevation requirement for July 15 of each year in the 2020 BiOp. Because UKL elevations fluctuated naturally prior to the construction of Link River Dam, USFWS allowed some variability in this condition as well.[3] Specifically, USFWS required Reclamation to manage UKL such that the July 15 elevation would not: 1) ever drop below 4,140.0 ft during any of the three years the PA was to be in effect; 2) drop below 4,140.5 ft more than once during that three-year cycle; and 3) drop below 4,140.8 ft (an elevation at which only half of the potential nursery habitat in UKL is available) in all three of those years.

37.    Reclamation complied with this condition in 2020, disregarded it in 2021 in favor of providing flows called for in the National Marine Fisheries Service's ("NMFS") 2019 biological opinion ("2019 NMFS BiOp) to benefit salmonids,[4] and have declared their intent to disregard it again in the 2022 Ops Plan. This is no mere accounting problem. Below elevation 4,140.0 ft, less than 12% of potential UKL nursery habitat is accessible to the C'waam and Koptu, with the amount decreasing in tandem with lower lake levels. Every drop of water taken out of UKL therefore has a corresponding effect on available nursery habitat – and thus on the chances of the survival of these species. At 4,139.2 ft, an elevation Reclamation has identified as a July 15 "objective" but not a requirement of the 2022 Ops Plan (that is, an elevation Reclamation may well deliberately fail to attain), less than 8% of potential nursery habitat would be accessible.

---

[3] USFWS also noted, however, that prior to that dam's construction, there were tens of thousands more acres of nursery habitat available to the C'waam and Koptu in UKL than remain after over a century of agriculturally-driven modifications to UKL. 2020 BiOp at § 7.3.1.2.

[4] The Klamath Tribes believe that Reclamation's 2021 allocation of the available water between C'waam and Koptu needs on one hand and salmonid needs on the other failed to comply with the ESA. The Tribes continue to pursue legal claims about the 2021 allocation decision in separate litigation. *Klamath Tribes v. U.S. Bureau of Reclamation*, No. 1:21-cv-00556-CL (D. Or.) (filed Apr. 13, 2021). But the inter-species allocation issues in that case are entirely distinct from those presented in this Complaint, which focus exclusively on the 2022 Ops Plan's illegal decision to provide water to Project irrigators ahead of C'waam and Koptu needs.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

38.     Even that figure, though, likely overstates where the 2022 class of baby fish will be able to find refuge to grow. Reclamation's own analysis has noted that larval C'waam and Koptu are distributed in UKL largely as a consequence of wind and water currents rather than of their own volition, meaning that they have no ability to seek out the full panoply of what is classed as potentially available nursery habitat. Hereford and Roberts, BOR 2019 at 13. As the authors explain:

> [T]o our knowledge, larval or juvenile [C'waam and Koptu] have not been captured or observed in a large portion of the wetland habitat in the northwestern part of UKL near Fish Banks and Pelican Bay areas; therefore, limiting the total wetland area considered to only wetlands where [C'waam or Koptu] have been captured (or are likely to occur) may provide a more accurate and meaningful analysis that would quantify available wetland-habitat, not all wetlands.

*Id.* As a practical matter, therefore, the 2022 Ops Plan intends to leave essentially no nursery habitat available for this year's class of fish. This ensures yet another year in which no young fish will survive long enough to begin to replace the current geriatric adults who are fast approaching their maximum recorded lifespan and may lose the ability to reproduce even before they die.

39.     On current trends, therefore, the C'waam will likely be functionally extinct in less than a decade and the Koptu within as few as 2-3 years. And both species are at continual risk that a catastrophic single-year die-off could drive them to that point even sooner.

C.      Calculation of the 2022 Spring/Summer Project Supply and Reclamation's 2022 Ops Plan

i.      *Formula for Allocating Water in UKL*

40.     As set forth in the 2020 BA and analyzed in the 2020 BiOp, Reclamation's method for allocating Klamath Basin water supplies among C'waam and Koptu, downriver salmonid needs, and Project irrigators during the spring/summer period is mathematically complicated to calculate but is based on a straightforward series of formulas to divide the available water supply

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

into three categories: 1) UKL Supply; 2) Environmental Water Account ("EWA"); and 3) Project Supply.

41.    UKL Supply is the most complicated figure to ascertain, but the equation for calculating it relies on three variables: 1) the amount of water physically in UKL at the end of February of a given year; 2) the amount of water the Natural Resources Conservation Service forecasts to flow into UKL from March 1 to September 30;[5] and 3) a calculated end-of-September "UKL storage target." In order to provide a baseline amount of water for the C'waam and Koptu, the UKL Supply equation subtracts the UKL storage target from the first two inputs to arrive at UKL Supply. *See* 2020 BA §§ 4.3.2.2.2.1, A.4.4.3; 2020 BiOp at § 4.3.2.4.1.[6]

42.    The EWA volume is the amount of water to be released from UKL to support salmonid needs in the Klamath River pursuant to the 2019 NMFS BiOp. 2020 BA § 4.3.2.2.2.3. It is calculated using a byzantine formula that is at core based on the size of UKL Supply, but cannot drop below 400,000 acre-feet of water ("AF") during each spring/summer period.[7] *Id*. at §§ 4.3.2.2.2.3, A.4.4.3. Additionally, in even-numbered years, 7,000 AF is added to EWA for the Yurok Tribe's ceremonial Boat Dance. *Id*. Due to this year's poor hydrology, and the fact that it is a Boat Dance year, the 2022 EWA was set on April 1 at 407,000 AF.

43.    Project Supply is the amount allocated for irrigation use. It is calculated by subtracting the EWA volume from the UKL Supply volume, and then subtracting an additional

---

[5] As Project Supply is recalculated at the start of April, May, and June, the actual amount of observed UKL inflow in March-May is added to the end-of-February volume as applicable, and the NRCS forecasted period is reduced to the remaining months of the spring/summer period.

[6] The 2020 BA renders the equation as follows: UKLSupply = [End of February UKL Storage] + [50% exceedance forecast UKL inflow for March through September] – [End of September UKL Storage Target]. 2020 BA at § A 4.4.3.

[7] An AF is a common measure of water volume, and refers to the volume of water necessary to cover an acre of land (an area roughly the size of a football field) one foot deep in water.

volume (7,436 AF, to be precise) to account for Project diversions at locations without water measurement devices. *See* 2020 BA at §§ 4.3.2.2.2.2, A4.4.3.[8] Irrespective of the formula, however, Project Supply cannot exceed 350,000 AF per spring/summer period per year. *Id*.

44.     As this formulaic approach illustrates, the needs of the C'waam, Koptu, and ESA-listed species in the Klamath River are prioritized over Project irrigators. That is, Reclamation's own formula requires the water needs of listed species to be addressed first. Only then can water be calculated as allocable to Project irrigators, and then only in compliance with the requirements of the 2020 BiOp's ITS (and those of the 2019 NMFS BiOp's ITS).[9]

45.     As with any model, the models which Reclamation utilizes to anticipate spring/summer hydrology to plug into the water allocation formula are not perfectly accurate. Acknowledging this reality, Reclamation recalculates its formula at various points in the season and the "final forecast" is made in June which may result in adjustments to UKL Supply, EWA, and Project Supply. *Id*. at § 3.2. Importantly, while UKL Supply and EWA volumes may be adjusted downward based on the June final forecast, "Project Supply cannot decrease below the April 1 allocation." *Id*. In other words, the initial Project Supply calculation at the beginning of the season is "locked in."[10]

46.     While the volume of water divertible as Project Supply may be modified during the irrigation season, *see* 2020 BA at § 4.3.2.2.2, Project irrigators begin diverting Project Supply

---

[8] The 2020 BA renders the equation as follows: PrjSupply = UKLSupply − EWA_River − PRJ_FlexAugment. 2020 BA at § A 4.4.3. (PRJ_FlexAugment is the way the 2020 BA refers to the 7,436 AF of unmeasured diversions.)

[9] "Regardless of the calculated Project Supply, Reclamation retains discretion to curtail deliveries from UKL as necessary to comply with applicable legal requirements or respond to hydrologic conditions as necessary." 2020 BA at § 4.3.2.2.2.

[10] The EWA volume is only susceptible to downward adjustment if it was initially set higher than 400,000 AF.

water from UKL as soon as Reclamation authorizes deliveries for the season. This means that even if Reclamation utilizes its discretion to curtail deliveries later in the season based on unanticipated hydrology or other factors, damage will have already been done to UKL elevations, and thus to C'waam and Koptu needs, if Project irrigators are authorized to divert water prior to these curtailments.

47.    A "key assumption" of the 2020 BiOp was that Reclamation would follow its water allocation formula. In fact, USFWS expressly forbade Reclamation from "deviati[ng] from the formulaic approach" if the deviation "create[s] adverse effects greater than was [sic] analyzed in [the 2020] BiOp, as is stated in the [2018 and 2020] BA." 2020 BiOp at § 7.2. This assumption was "integral" to the 2020 BiOp's ITS. *Id*. at 11.1.

ii.    *Reclamation's Disregard of the Formula in Determining Project Supply in the 2022 Ops Plan and Approval of that Plan by USFWS*

48.    Despite the hydrologic challenges that arose during the spring/summer period in 2020 and 2021, Reclamation adhered to the allocation formula for determining Project Supply in those years.[11] This year, however, Reclamation inexplicably disregarded the formula when it allocated water to the Project in the 2022 Ops Plan, and did so to the direct detriment of the C'waam and Koptu. This is so because under the formula, Project Supply for spring/summer 2022 should have been set at *zero* on April 1, meaning that all water in UKL beyond that assigned to the EWA should have been available for C'waam and Koptu needs.

49.    The math necessary to illustrate this conclusion, as prescribed by the 2020 BA, is

---

[11] In its 2021 Operations Plan, Reclamation stated an intention to deviate from the formula with a goal of delivering more water to the Project. In practice, however, it did not do so and instead managed for spring/summer 2021 using a volume of 33,000 AF as Project Supply, which is precisely the number the formula determined.

clear cut. As of April 1, 2022, the UKL Supply for the current season was 409,622 AF.[12] *See* 2020 BA at § 4.3.2.2.2.1, A 4.4.3. Because UKL Supply was less than 671,000 AF, EWA as of April 1, 2022, was 407,000 AF.[13] *See* 2020 BA at § 4.3.2.2.2.3, A 4.4.3. When the EWA volume and the unmeasured Project diversions volume is subtracted from UKL Supply, the amount left for Project Supply is a negative number,[14] meaning there should have been a Project allocation of zero as of April 1, 2022.

50.     In the 2022 Ops Plan, however, Reclamation proposed a Project Supply of 62,000 AF, a number it appears to have back calculated by estimating how much water would be available in UKL if Reclamation simply managed the Lake to an end-of-season elevation of 4,138.15 ft without making any effort to meet the April/May or July 15 elevations required by the 2020 BiOp. *See* 2022 Ops Plan at 4, 6.[15] Compounding the egregiousness of this decision, Reclamation proposed to authorize Project deliveries from the Project Supply beginning April 15, 2022, exacerbating the impacts of its decision on UKL elevations in the middle of C'waam and Koptu spawning season. *See id* at 6.

51.     Reclamation transmitted its proposed 2022 operating procedures (which are materially identical to what was adopted in the 2022 Ops Plan) to USFWS for review on April 9, 2022. USFWS responded on April 11, 2022, describing its assessment of Reclamation's plan. In its response memo, USFWS acknowledged that poor hydrology would prevent Reclamation from

---

[12] This value is equal to 275,000 AF (the observed and anticipated inflows to UKL from March 1, 2022, to September 30, 2022) added to 134,662 AF (the storage in UKL on February 28, 2022, in excess of the volume needed to meet of the calculated end-of-September UKL Storage Target, which this year is set at 4138.78 ft).
[13] This includes 7,000 AF for the 2022 Yurok ceremonial Boat Dance.
[14] 409,622-407,000-7,436= -4,814.
[15] Page citations to the 2022 Ops Plan are to the pdf pages rather than the document's internal pagination.

attaining the April/May and July 15 UKL elevations called for by the 2020 BiOp, a failure which "will greatly reduce larval sucker rearing habitat in UKL this year…." USFWS 2022 Ops Plan Response at 2. USFWS therefore urged Reclamation "to take any available steps to maintain UKL elevation as high as possible through July 15." *Id.* But, failing to heed its own warning, USFWS did not stop Reclamation from implementing its proposal – even though Reclamation's plan would invalidate a key assumption of the 2020 BiOp by deviating from the water allocation formula in ways that would undoubtedly cause UKL elevations to decrease by more than the application of the formula would have done, thus causing adverse effects on the C'waam and Koptu greater than if the formula had been followed. *See generally id.* This omission on USFWS' part is particularly problematic where its memo underscored the point that while Reclamation's proposal to manage UKL to an end-of-season elevation of 4,138.15 would provide some benefits to the adult C'waam and Koptu, "meeting this elevation does not avoid the biological impacts to suckers that missing the earlier season elevations creates…." *Id.*

52.    Without opposition from USFWS (or NMFS), Reclamation adopted the 2022 Ops Plan unchanged from its proposed version on April 11, 2022.

53.    While the Tribes are unaware of the exact reasoning for Reclamation's decision to deviate from its established formula in calculating Project Supply, it appears that Reclamation concluded that because it would not be able to meet the April/May and July 15 minimum UKL elevation levels required by the 2020 BiOp, it somehow had unfettered discretion to change its calculation method so long as it did not let UKL levels drop below the absolute minimum of 4138.0 feet.

54.    But irrespective of the thought process behind it, Reclamation's adoption of the 2022 Ops Plan has ignored its ESA obligations to C'waam and Koptu and their critical habitat,

which already have been and will continue to be adversely affected by Reclamation's authorization of Project deliveries which began on April 15, 2022. Every decrease in UKL elevations below those necessary to meet C'waam and Koptu needs at <u>every</u> point in the spring/summer season is a violation of the ESA's command to avoid jeopardy and the adverse modification of critical habitat.

> D.    Reclamation's issuance of the DNA

55.    Reclamation prepared EAs and FONSIs in connection with its promulgation of its 2020 and 2021 operational plans. It did not do so for the 2022 Ops Plan. Instead, on April 11, 2022, Reclamation issued the DNA.

56.    In the DNA, Reclamation concluded that the NEPA analysis completed for the 2020 and 2021 Project operations plans adequately assessed the environmental effects of the 2022 Ops Plan and Reclamation's identified no-action alternative to it and that Reclamation therefore did not need to complete a new NEPA analysis on the 2022 Ops Plan.

57.    Specifically, Reclamation found the 2022 Ops Plan "includes foundational features of and is essentially similar to components discussed in the 2020 and 2021 [NEPA analyses] alternatives." DNA at 6. Reclamation pointed to the 2020 NEPA analysis which analyzed two alternatives—managing the Project pursuant to the 2018 operations plan and managing the Project pursuant to the 2020 operations plan—which Reclamation claimed both "included the same foundational approach to a water supply operational strategy focusing on UKL elevations, Klamath River flows, and Project Supply diversions" as the 2022 Ops Plan. *Id*. Reclamation also concluded that the two previously analyzed alternatives "took into account similar Klamath River and UKL management components to calculate and manage Project Supply during the spring/summer period." *Id*. Additionally, Reclamation stated that the 2022 Ops Plan utilized the modeling and water allocation formula "similar to the [2020 and 2021 operations plans] . . . to develop reasonable

projections for Project Supply allocations . . . ." *Id*. at 7.

58.     However, as explained in detail above and contrary to Reclamation's assertions in the DNA, Reclamation did not follow the water allocation formula previously set out in the 2020 BA that it utilized in managing the Project in 2020 and 2021. Rather, Reclamation deviated from the formula, resulting in it proposing to provide significantly more water for Project irrigators than if it had actually followed the PA's water allocation formula as it had in prior years. Worse, Reclamation authorized diversion of this improperly large allocation beginning on April 15, 2022, in the middle of C'waam and Koptu spawning season during what Reclamation and USFWS have both termed "unprecedented drought conditions." U.S. Dep't of the Interior, Bureau of Reclamation, Mem. from Alan C. Heck, Jr., Acting Area Manager, Klamath Falls Area Office to Acting Field Supervisor, U.S. Fish and Wildlife Service (Apr. 9, 2022) at 2; USFWS 2022 Ops Plan Response at 1. Neither the 2020 nor 2021 NEPA analysis meaningfully considered the possibility that Reclamation would deviate from the formula to significantly increase the Project allocation *and* authorize such an early start to irrigation diversions, all under hydrologic conditions already outside the scope of the effects analysis of the 2020 BiOp. Accordingly, Reclamation's determination that its proposed action in the 2022 Ops Plan is substantially the same as previously analyzed in the existing NEPA analysis for the 2020 and 2021 operations plan is arbitrary and capricious.

## CLAIMS FOR RELIEF

### COUNT 1:
### ENDANGERED SPECIES ACT SECTION 9 –
Reclamation Is Committing Unlawful Take of Endangered C'waam and Koptu
(Declaratory and Injunctive Relief)

59.     The Tribes re-allege each and every allegation set forth in this complaint.

60.     Section 9 of the ESA prohibits Reclamation from taking a listed species unless the

taking is within the safe harbor provision of an ITS. 16 U.S.C. § 1538(a)(1)(B); 16 U.S.C. § 1536(a)(2).

61.    The take prohibition applies to "any person." 16 U.S.C. § 1538(a)(1). The ESA defines "any person" to include any officer, employee, agent, department, or instrumentality of the Federal Government." 16 U.S.C. § 1532(13). The ESA citizen suit provision authorizes suits to enforce the ESA and its implementing regulations against any person, including federal agencies. 16 U.S.C. § 1540(g)(1).

62.    Reclamation is a person subject to the ESA take prohibition and to ESA citizen suits.

63.    "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

64.    USFWS has defined "harm" by regulation to mean:

> an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

> 50 C.F.R. § 17.3.

65.    USFWS has defined "harass" by regulation to mean:

> an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering.

> 50 C.F.R. § 17.3.

66.    The 2020 BiOp's ITS was based on key assumptions, including that Reclamation would follow the formula set forth in the 2020 BA in allocating water from UKL. *See* 2020 BiOp at § 11.1. That ITS also directs Reclamation to "adaptively manage and take *corrective* actions" if

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"a progressive decrease in [UKL] elevations that is projected to fall outside the [minimum conditions set forth in 2020 BiOp] is identified." 2020 BiOp at § 11.3.2 (T&C 1c) (emphasis added). This requirement is "nondiscretionary." *Id.* at § 11.3.2.

67.     The poor hydrology confronting the Klamath Basin in 2022 and Reclamation's formulaic allocation of water to the EWA have created a situation where Reclamation is unable to meet the minimum boundary conditions of the 2020 BiOp. Yet instead of taking corrective action, Reclamation's decision to provide water to Project irrigators that they should not have had access to under Reclamation's own water allocation formula directly exacerbates the perils the C'waam and Koptu confront this year, which are far outside the effects analysis of the 2020 BiOp. Reclamation has thus lost the right to shelter under the 2020 BiOp's ITS.

68.     Diversions of Project Supply contrary to Reclamation's own water allocation formula began on April 15, 2022.

69.     Reclamation's authorization of diversions of Project Supply beginning on April 15, 2022, contrary to its own water allocation formula, have directly decreased and will continue to directly decrease UKL elevations which has and will continue to "harm" C'waam and Koptu in violation of the ESA due to "significant habitat modification or degradation" which has and will continue to "actually kill[] or injure[]" the species "by significantly impairing essential behavioral patterns, including breeding, feeding [and] sheltering."

70.     Reclamation's authorization of diversions of Project Supply beginning on April 15, 2022, contrary to its own water allocation formula, have and will continue to "harass" C'waam and Koptu in violation of the ESA as Reclamation's improper authorization of Project Supply diversions is an "intentional" act "which creates the likelihood of injury to [the species] by annoying [them] to such an extent as to significantly disrupt normal behavior patterns which

include, but are not limited to, breeding, feeding, [and] sheltering."

71.    Reclamation's illegal take of C'waam and Koptu has harmed and is harming the Klamath Tribes, including by further diminishing their ability to exercise their treaty rights and spiritual and cultural practices centered on the C'waam and Koptu, and the Klamath Tribes have no adequate remedy at law.

72.    Accordingly, pursuant to 16 U.S.C. § 1540(g)(1)(A), the Klamath Tribes are entitled to a declaration that by adopting the 2022 Ops Plan Reclamation has lost the right to shelter under the 2020 BiOp's ITS. The Tribes are also entitled to an injunction against further unlawful take of C'waam and Koptu.

**COUNT II:**
**ENDANGERED SPECIES ACT SECTION 7 –**
Reclamation Is Violating its Duties to Avoid Jeopardy to the C'waam and Koptu
and Adverse Modification to Their Critical Habitat
(Declaratory and Injunctive Relief)

73.    The Klamath Tribes incorporate by reference all preceding paragraphs as if fully alleged herein.

74.    The ESA requires that Reclamation "insure" that its operation of the Klamath Project "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . .." 16 U.S.C. § 1536(a)(2).

75.    The 2020 BiOp's no-jeopardy conclusion was based on several key assumptions, including that Reclamation would follow the formula set forth in the 2020 BA in allocating water from UKL and that, if hydrologic conditions compromised Reclamation's ability to meet the minimum UKL elevations set forth in that BiOp, Reclamation would adaptively manage and take corrective action to avoid impacts to the C'waam and Koptu outside the scope of that BiOp's

effects analysis.

76.    The 2022 Ops Plan, by contrast, not only departs from the conditions set forth in the 2020 BiOp, but aggravates rather than alleviates the effects of this year's poor hydrology on the C'waam and Koptu by actively reducing the amount of habitat available in UKL for critical spawning and rearing functions. The result of Reclamation's choices reflected in the 2022 Ops Plan, most acutely in its departure from Reclamation's own water allocation formula and its decision to drive UKL elevations even lower by authorizing diversions of Project Supply starting on April 15, 2022, is the likely death of this entire year class of baby C'waam and Koptu. While reproductive success is never guaranteed, the advanced age of the surviving adults means that each spawning season is one of an ever-diminishing number of opportunities to alter the species' trajectory toward extinction. By improperly precluding that opportunity in its entirety for 2022, Reclamation is directly jeopardizing the C'waam and Koptu.

77.    By actively reducing the amount of habitat available in UKL for critical spawning and rearing functions, Reclamation's authorization of diversions utilizing the improperly calculated Project Supply beginning on April 15, 2022, have adversely modified the C'waam and Koptu's critical habitat in UKL and will continue to do so, including by diminishing the amount of habitat available for vital spawning and rearing activities.

78.    Reclamation's continued operation of the Project in a manner that fails to insure against jeopardy to the C'waam and Koptu and/or the unlawful modification of their critical habitat has harmed and is harming the Klamath Tribes, including by further diminishing their ability to exercise their treaty rights and spiritual and cultural practices centered on the C'waam and Koptu, and the Klamath Tribes have no adequate remedy at law.

79.    Accordingly, pursuant to 16 U.S.C. § 1540(g)(1)(A), the Klamath Tribes are

entitled to a declaration that the 2022 Ops Plan violates Section 7 of the ESA by jeopardizing the C'waam and Koptu and adversely modifying their critical habitat. The Tribes are also entitled to an injunction prohibiting Reclamation from further operating the Project in a manner that causes jeopardy to the C'waam and Koptu or modifies their critical habitat.

<u>COUNT III:</u>
<u>ADMINSTRATIVE PROCEDURES ACT –</u>
<u>USFWS Arbitrarily and Capriciously Violated its Duties to Avoid Jeopardy to the C'waam and Koptu and Adverse Modification to Their Critical Habitat in Violation of the APA By Failing to Rescind the 2020 BiOp's ITS in Light of Reclamation's Adoption of the 2022 Ops Plan</u>
<u>(Declaratory and Injunctive Relief)</u>

80.    The Tribes re-allege each and every allegation set forth in this complaint.

81.    As an implementing agency under the ESA, even after the issuance of the biological opinion, USFWS has an independent duty to ensure that Reclamation's actions in the operation of the Project do not violate the ESA's prohibitions against jeopardy and adverse modification. *See* 50 C.F.R. 402.16.

82.    The 2020 BiOp's ITS was based on certain terms and conditions that required Reclamation to operate the Project to meet minimum UKL elevations at various points in the spring/summer season. USFWS required Reclamation to immediately consult if these elevations could not be met in order to determine causation for why such elevations are unattainable and whether the causative factors are within the scope of those analyzed in the USFWS 2020 BiOp so that Reclamation can "adaptively manage and take corrective actions." 2020 BiOp at § 11.3.2 (T&C 1c).

83.    Anticipating that 2022's hydrologic conditions would make it challenging for Reclamation to comply simultaneously with the requirements of the 2020 BiOp and the 2019 NMFS BiOp, Reclamation initiated a "meet-and-confer" process with USFWS and NMFS on February 25, 2022. 2022 Ops Plan at 3. Reclamation transmitted its proposed 2022 operating

procedures (which, as noted above, are materially identical to what was adopted in the 2022 Ops Plan) to USFWS on April 9, 2022.

84.    USFWS responded to Reclamation's proposal on April 11, 2022. In its response memo, USFWS acknowledged that "[t]he hydrologic conditions observed this year represent an ongoing natural disaster that is beyond the control of Reclamation[,]" and that "[w]hile we are deeply concerned about the impacts that missing [the minimum UKL elevation conditions of the 2020 BiOp] will have on [the C'waam and Koptu], we understand that historically poor hydrology is the root cause for invoking the meet and confer process." USFWS 2022 Ops Plan Response at 1.

85.    But USFWS' response memo failed to address the fact that Reclamation proposed to make a Project allocation in direct contravention of the 2020 BA's water allocation formula. Consequently, USFWS also failed to address the cumulative impacts the diversion of this water would have on the C'waam and Koptu over and above the effects of this year's poor hydrology. Nor did it even mention, let alone address, the 2022 Ops Plan's failure to consider whether and how Reclamation's proposed plan might affect Reclamation's ability to comply with the secondary April/May boundary condition required by the 2020 BiOp (of matching the elevations UKL experienced in April and May of 2010) in the event that the primary minimum elevation of 4,142.0 ft could not be maintained.[16] Nor did it address the relationship between Reclamation's proposed plan for 2022 and the prior two years of poor hydrology, which individually and cumulatively fell outside the scope of the effects analysis of the 2020 BiOp. Rather, after identifying the devastating

---

[16] Reclamation only passed out of compliance with the 2010 elevation sub-floor after it authorized the commencement of diversions of Project Supply on April 15, 2022, meaning that deferring irrigation deliveries unless and until UKL elevations improved – which is precisely what Reclamation's water allocation formula provides – could have helped Reclamation better comply with this sub-floor condition.

impacts the 2022 Ops Plan would have on C'waam and Koptu by virtue of missing the April/May

4,142.0 ft and minimum July 15 elevations, USFWS essentially closed its eyes on 2022 and

decided to look instead to a hoped-for future:

> We recognize the devastating impacts to the river and Project irrigators that occurred last year when Reclamation withheld a [surface flushing flow] and was only able to provide the calculated minimum Project Supply of 33,000 acre-feet. Despite these withholdings last year, [C'waam and Koptu] in UKL still experienced suboptimal conditions due to drought conditions, and they, and the Klamath Tribes for whom these fish are sacred, will feel those impacts *more acutely this year*. We cannot rely upon improved hydrology next year, and the dire condition of sucker populations in UKL means that substantive steps must be taken *in the future* to provide for the survival and recovery of these fish. We look forward to working with Reclamation to take advantage of ongoing reinitiated consultation on Project operations and the impending expiration of [USFWS's] BiOp on September 30, 2022, to realize improved resource management to benefit suckers, as well as meet the needs of salmon and agriculture.

USFWS 2022 Ops Plan Response at 2 (emphasis added). But the condition of the C'waam and

Koptu is too precarious to be able to kick the can down the road to some nebulous future –

particularly in light of USFWS' own recognition of the "dire" condition of the species and the

uncertainty as to whether coming years will bring improved hydrologic conditions.

86.     In light of Reclamation's dramatic and unjustified departure from its own water

allocation formula in the 2022 Ops Plan, USFWS had an independent obligation under the ESA to

substantively assess whether the impacts of Reclamation's departure from key conditions of the

2020 BiOp's ITS in the 2022 Ops Plan departures would have on the C'waam and Koptu *this* year

constitute jeopardy to the species or adverse modification of their critical habitat. USFWS' failure

to do so, and its concomitant failure to modify or invalidate the 2020 BiOp's ITS as it applies to

the 2022 Ops Plan, was arbitrary and capricious, and not in accordance with the requirements of

the ESA, and thus violates the APA.

87.     Accordingly, pursuant to 5 U.S.C. § 702, the Klamath Tribes are entitled to an

injunction setting aside the 2020 USFWS BiOp's ITS as applied to the 2022 Ops Plan.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## COUNT IV:
## NATIONAL ENVIRONMENTAL POLICY ACT

Reclamation Arbitrarily and Capriciously Violated its NEPA Obligations in Violation of the
APA By Finding the Effects of the 2022 Ops Plan were Evaluated and Considered in Existing
NEPA Analyses
(Declaratory and Injunctive Relief)

88.     The Tribes re-allege each and every allegation set forth in this complaint.

89.     The 2022 Ops Plan is a "major federal action" that "significantly affect[s] the
quality of the human environment." Therefore, a NEPA analysis was required before Reclamation
could implement the 2022 Ops Plan.

90.     Reclamation completed NEPA analyses for the 2020 and 2021 Project operations
plans. The 2020 operations plan compared the effects of two alternatives. The first was a so-called
"no action" alternative, which (among other things) calculated Project Supply using the water
allocation formula set forth in Reclamation's 2018 biological assessment ("2018 BA").[17] That
formula is practically identical to the one contained in the 2020 BA. And it was the possibility of
continuing to operate under the 2018 proposed action that comprised the other alternative analyzed
in the 2020 EA. The 2020 EA cannot therefore reasonably be construed to have evaluated the
environmental effects of deviations from the formula under hydrologic conditions outside the
scope of the 2020 BA's effects analysis.

91.     In its 2021 EA, Reclamation also analyzed two alternatives. One was a "no action"
alternative of operating under the 2020 BA approach, with Project Supply calculated pursuant to
the regular water allocation formula with a mid-April start date for irrigation. The other was a

---

[17] The 2018 BA was analyzed by NMFS as part of its preparation and issuance of the 2019 NMFS
BiOp. It was also analyzed by USFWS as part of the preparation of its own biological opinion in
2019. Subsequent modifications to Reclamation's PA led to the reconsultation that resulted in the
preparation of the 2020 BA and USFWS' issuance of the 2020 BiOp. (NMFS did not believe those
modifications required any changes to the 2019 NMFS BiOp.)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"proposed action" that did purport to depart from the 2020 BA's allocation formula for Project Supply. But it proposed to do so in a manner that was *more* rather than *less* protective of lakeshore C'waam spawning. That is, the contemplated departure was to calculate *no* initial Project Supply and instead to adaptively manage in real time based on subsequent inflows with a possible Project start date no earlier than May 15, 2021. 2021 Supplemental Environmental Assessment re. Implementation of Klamath Project Temporary Operating Procedures April – September 2021, Klamath Project, Oregon/California, CGB-EA-2021-024 (April 14, 2021) ("2021 EA") at 37-38.[18] As Reclamation explained, "[u]nder the Proposed Action Alternative, the delay in the start of the irrigation season, as compared to the No Action Alternative, allows for UKL to continue to gain elevation, to the extent hydrologic conditions allow, during the spring months." 2021 EA at 38.[19]

92.    Neither the 2020 EA nor the 2021 EA evaluated the potential environmental impacts of an alternative that contemplated a scenario with unprecedented drought conditions outside the scope of the 2020 BiOp's effects analysis, a departure from the 2020 BA's formulaic approach to calculating Project Supply, a Project diversion start date in the middle of C'waam and Koptu spawning season, and no attempt to meet either USFWS' UKL April/May sub-floor condition or the required July 15 UKL elevation condition. Reclamation's 2022 Ops Plan therefore resulted in effects to the human environment that were not adequately assessed in the NEPA analyses for the 2020 and 2021 operations plan.

93.    Reclamation's contrary finding—that the 2020 and 2021 NEPA analyses adequately assessed the environmental effects of the 2022 Ops Plan—was arbitrary and capricious,

---

[18] Page citations to the 2021 EA are to the pdf pages rather than the document's internal pagination.

[19] It also bears noting that due to 2021's disastrous hydrology and as a consequence of the Klamath Drainage District ("KDD") diverting water contrary to Reclamation's directives, Reclamation ultimately allowed no other diversions of Project Supply in 2021 and utilized the formulaic Project Supply volume of 33,000 AF in accounting for the water KDD took.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

an abuse of discretion, and not in accordance with NEPA requirements, and thus violates the APA.

94.    Accordingly, pursuant to 5 U.S.C. § 702, the Klamath Tribes are entitled to a declaration that the DNA is inadequate to legally satisfy Reclamation's NEPA obligations. The Tribes are also entitled to an injunction prohibiting Reclamation from allowing further diversions of purported Project Supply until it validly complies with those obligations.

## PRAYER FOR RELIEF

WHEREFORE, the Klamath Tribes pray as follows:

A.    The Court adjudge and declare that Reclamation has violated the ESA by unlawfully taking C'waam and Koptu, destroying and adversely modifying their critical habitat, and jeopardizing their continued existence through its adoption of the 2022 Ops Plan and its authorization of the diversion of improperly calculated Project Supply beginning on April 15, 2022;

B.    The Court enjoin, pursuant to 16 U.S.C. § 1540(g)(1)(A) and 5 U.S.C. § 706, Reclamation from further unlawful take of C'waam and Koptu.

C.    The Court hold unlawful and set aside USFWS' 2020 USFWS BiOp's ITS as applied to the 2022 Ops Plan pursuant to 5 U.S.C. § 706(2)(a);

D.    The Court hold unlawful and set aside Reclamation's DNA and enjoin Reclamation from authorizing any further diversions of purported Project Supply unless and until it validly complies with its NEPA obligations;

E.    The Court award the Klamath Tribes their attorneys' fees and costs pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4), and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.    The Court grant such other and further relief as it may deem appropriate, or as

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

justice requires.

Dated: May 9, 2022

Respectfully submitted,

ROSETTE, LLP

*/s/ Jay D. Weiner*

_____

Jay D. Weiner (OSBA No. 182247)
Rosette, LLP
1415 L St. Suite 450
Sacramento, California 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
jweiner@rosettelaw.com

Attorney for Plaintiff
The Klamath Tribes

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**