IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE KLAMATH TRIBES, a federally
recognized Indian Tribe,

        Plaintiff,

        v.

UNITED STATES BUREAU OF
RECLAMATION,

        Defendant

KLAMATH WATER USERS
ASSOCATION
and KLAMATH IRRIGATION DISTRICT,

        Defendant-Intervenors.

Case No. 1:22-cv-00680-CL

OPINION & ORDER

MCSHANE, Judge:

       Magistrate Judge Mark D. Clarke filed a Findings and Recommendation ("F&R") on September 11, 2023, recommending the Court grant Plaintiff's motion for summary judgment (ECF No. 58). The matter is now before this Court on Defendants' objections. *See* 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b). I review *de novo*. *United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1998). I find no error and conclude the report is correct.

1 – OPINION & ORDER

**DISCUSSION**

Defendant Bureau of Reclamation ("Reclamation") and Defendant-Intervenor Klamath Water Users Association ("KWUA") raise three jurisdictional objections to Judge Clarke's F&R. First, Reclamation and KWUA argue that the case is moot because the Klamath Tribes' ("the Tribes") claims lack redressability and the Court is therefore unable to grant any meaningful relief. Def.'s Obj. 11, ECF No. 66; Def.-Int.'s Obj. 8, ECF No. 67. Defendants further argue that the complaint is moot because it does not satisfy the "capable of repetition, yet evading review" exception. Def.'s Obj. 5–6; Def.-Int.'s Obj. 8. Finally, Reclamation and KWUA object that the Tribes did not comply with the Endangered Species Act's ("ESA") mandatory 60-day notice requirement. Def.'s Obj. 15; Def.-Int.'s Obj. 10.

Defendants also object to Judge Clarke's recommendation to grant summary judgment to the Tribes on their claims pursuant to Sections 7 and 9 of the ESA and National Environmental Policy Act ("NEPA"). Def.'s Obj. 20–27; Def.-Int.'s Obj. 14–17. The Court addresses each objection in turn.

**I.   Standing**

Defendants first object that the Tribes lack standing to sue because their claims for declaratory relief lack redressability and any judgment would therefore be an "improper advisory opinion." Def.'s Obj. 13; Def.-Int.'s Obj. 7. The Court holds that the Tribes' injuries are redressable because they are not tethered to the expiration of the 2022 Temporary Operating Procedures ("TOP").

To satisfy Article III's standing requirements, a plaintiff must show that: (1) they have suffered an "injury in fact;" (2) the injury is "fairly traceable" to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180–81 (2000). To establish redressability, a plaintiff must show that the relief sought is both (1) substantially likely to redress the claimed injury, and (2) within the court's power to award. *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "A case or controversy exists justifying declaratory relief only when 'the challenged government activity … is not contingent, has not evaporated or disappeared, and by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interest of the petitioning parties.'" *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Distr.*, 893 F.2d 1012, 1015 (9th Cir. 1989).

The Ninth Circuit has repeatedly held that "where both injunctive and declaratory relief are sought but the request for an injunction is rendered moot during litigation, if a declaratory judgment would nevertheless provide effective relief the action is not moot." *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006). A plaintiff therefore maintains standing to sue as long as the court is "not merely propounding on hypothetical questions of law" but is "resolving a dispute which has present and future consequences." *Northwest Envtl. Defense Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (challenge to regulations governing 1986 salmon fishing season was not mooted by the close of the season because the damage could be mitigated "by allowing more fish to spawn in 1989").

The Tribes' harm is redressable, and they possess standing to sue in the present case. As the F&R asserts and the record supports, "drought conditions across the Klamath Basin are likely remain a 'brooding presence' over the Klamath Basin for the foreseeable future" impacting Reclamation's water resource allocation decisions. F&R 25 (quoting *Nat. Res. Def. Council v.*

*McCarthy*, 231 F. Supp. 3d 491, 498 (N.D. Cal. 2017)). A letter from Reclamation dated December 15, 2023, provides further support for this assertion. In that letter, Reclamation stated a now familiar refrain: "[t]he Klamath Basin is experiencing abnormally dry conditions" with the "potential to impact Reclamation's ability to ensure full compliance with Endangered Species Act (ESA) requirements." Pl.'s Resp. Ex. A, at 1, ECF No. 68. This suggests that Reclamation's action—the diversion of water to Klamath Project irrigators—and the resulting harm alleged to the endangered Lost River sucker (C'waam) and shortnose sucker (Koptu) is reasonably likely to be repeated.

Reclamation seeks to distinguish the current case from *United States v. Klamath Drainage District*, where the district court rejected defendant's mootness argument. Def.'s Obj. 14; *United States v. Klamath Drainage Dist.*, No. 1:22-cv-00962-CL, 2023 WL 5899910, *11 (D. Or. Sept. 11, 2023). In short, Reclamation argues that the alleged harm in *Klamath Drainage District* was correctly found redressable because it involved a longstanding and ongoing contract dispute, whereas here the present controversy involves a challenge to the agency's expired 2022 TOP. Reclamation frames the issue far too narrowly. Reclamation need not adopt a plan that is *identical* to the 2022 TOP for the Tribes' harm to be redressable.

The Tribes possess standing to sue for declaratory judgment that Reclamation violated both the ESA and NEPA in order to ensure that similar violations do not occur in the future.

**II.   Mootness**

Defendants also object that the case is moot because Judge Clarke improperly found an exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Def.'s Obj. 5–6; Def.-Int.'s Obj. 8. This exception only applies in circumstances where "(1) the

challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016). Plaintiff's claims satisfy both prongs of the mootness exception.

First, the duration requirement is clearly met. As Judge Clarke's F&R correctly observed, Supreme Court precedent on this point is definitive: "a period of two years is too short to complete judicial review[.]" F&R 25 (quoting *Kingdomware*, 579 U.S. at 170); *see also Alaska Fish & Wildlife Federation & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 939 (9th Cir. 1987). Here, Reclamation's operation of the Klamath Project and its water allocation decisions made pursuant to the agency's 2022 Temporary Operating Procedures ("2022 TOP") were only in effect for less than a year.

The Tribes' claim for declaratory relief also satisfies the "same action" requirement. A controversy is capable of repetition where there is "a reasonable expectation that [the parties] will again litigate the issue" or a "demonstrated probability" that the action will recur. *Biodiversity Legal Found. v. Badgely*, 309 F.3d 1166, 1174 (9th Cir. 2002); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). Defendants argue that the repetition requirement is not met because Reclamation is now operating under a new TOP ("2023 TOP") and a new Biological Opinion that requires the agency to reinitiate ESA consultation if boundary conditions in the Upper Klamath Lake cannot be met. Defendants again frame the issue too narrowly. The question is not whether Reclamation might adopt a plan *identical* to the 2021 TOP; rather, the question is whether Reclamation's operation of the Klamath Project and the agency's continued water resource allocation decisions are likely to affect the endangered Lost River and shortnose

suckers. The fact that Reclamation has adopted similar TOPs in each of the past three years—in 2021, 2022, and 2023—together with the fact that drought conditions are likely to remain a "brooding presence" over the Klamath Basin for the foreseeable future suggests that recurrence of the controversy is more than "mere physical or theoretical possibility." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). In other words, "there remains a reasonable expectation that Reclamation's water allocation decisions during recurring drought conditions will cause Upper Klamath Lake elevation boundaries to drop below the levels necessary to sustain the suckers' critical life functions." F&R 26.

Finally, "the existence of a 'public interest in having the legality of … [Reclamation's] practices settled … [also] militates against a mootness conclusion.'" *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, (1953). The Court finds an exception to the mootness doctrine for cases "capable of repetition, yet evading review."

### III. Compliance with the ESA's 60-day Notice Requirement

Defendants next object that this Court lacks subject matter jurisdiction because Plaintiff's notice was procedurally and substantively inadequate under the ESA. Def.'s Obj. 15; Def.-Int. Obj. 10–11. The Court holds that the Tribes' notice was adequate.

The ESA provides in part that "[n]o action may be commenced … prior to sixty days after written notice has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i). The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of*

*Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998). Notice is a jurisdictional requirement and "failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Id.*

But a citizen "is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002). Instead, the notice "need only provide enough information that the defendant can identify and correct the problem." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015). The analysis therefore turns on the "overall sufficiency" and purpose of the notice. *Id.*; *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) (examining "the letter as a whole" for notice sufficiency).

The Tribes' March 10, 2022, letter substantively satisfied the ESA's notice requirement. That letter warned Reclamation that "there will simply not be enough water to meet the needs of both the C'Waam and Koptu in the Upper Basin and the needs of the anadromous species in the Klamath River." F&R 28. It also referenced the parties' extensive litigation history and further stated that pausing water deliveries to Klamath Project irrigators would be a "necessary (but not sufficient step) for Reclamation … to comply with its obligations under the Endangered Species Act." U.S. Bureau of Reclamation Ex. 1, at 3, ECF No. 19-1 (letter on file with court). The letter therefore put Reclamation on notice that failure to deviate from the 2022 TOP could result in a citizen suit under the ESA.

For the same reasons, the Tribes' March 10 letter was also procedurally adequate and satisfied the ESA's 60-day notice requirement. Even if the notice letter was anticipatory—and it

7 – OPINION & ORDER

was not—there is no controlling Ninth Circuit precedent as to whether anticipatory notices are permitted under the ESA. *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1219–20 (D. Colo. 2011) (collecting cases); c*ompare Cascadia Wildlands v. Scott Timber Co.* 328 F. Supp. 3d 1119, 1131 (D. Or. 2018) ("neither the statute nor the case law supports a bright-line rule against anticipatory notice of future violations"), *with Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F. Supp. 433, 440 (D. Or. 1994) (dismissing plaintiff's ESA claims for failure to comply with the statute's 60-day notice requirement because it was anticipatory).

Accordingly, the Tribes' notice was neither procedurally nor substantively inadequate. It provided sufficient information for Reclamation to ascertain the nature of the alleged violation and gave the agency sufficient time to address the issue and take corrective action.

## IV.   Violation of Section 7 the ESA

Defendants also object to the merits of Judge Clarke's recommendation. They argue that although Upper Klamath Lake boundary conditions could not be met because of excessive drought, the agency's operations under the 2022 TOP were reasonable "corrective actions" under Term 1c of the Fish and Wildlife Service ("FWS") Biological Opinion and Incidental Take Statement. Def.'s Obj. 20; Def.-Int.'s Obj. 14.

Section 7 is the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). It requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of designated critical habitats." 16 U.S.C. § 1536(a)(2). An action jeopardizes the continued existence of a species if it "reasonably would be expected,

directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

Any agency contemplating an action that may affect a listed species or its critical habitat must consult with FWS or NOAA before taking action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). This consultation requirement was "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). If the proposed action is likely to adversely affect a listed species, formal consultation is required and the consulting agency must prepare a Biological Opinion "detailing now the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). "A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a biological opinion must not have been arbitrary or capricious" under § 706 of the Administrative Procedure Act. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

In the instant case, Reclamation violated Section 7 of the ESA by allocating water to Klamath Project irrigators instead of halting diversions in order minimize harm to the Lost River and shortnose suckers. Reclamation's decision cannot plausibly be characterized as a "corrective action" under Term 1c of the Biological Opinion. The fact that Upper Klamath Lake boundary conditions could not have been met regardless of whether Reclamation made any irrigation diversions did not absolve the agency of its responsibility under the ESA to halt diversions in order to minimize the inevitable harm to the Lost River and shortnose suckers. The Ninth Circuit has repeatedly held that irrigators rights are "subservient" to both the Tribes' rights and

Reclamation's ESA responsibilities. *In re Klamath Irrigation Dist.*, 69 F.4th 934, 939 (9th Cir. 2023); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999) ("the requirements of the ESA … override the water rights of the Irrigator"). The fact that excessive drought—not Project diversions—forced Reclamation to operate outside Upper Klamath Lake boundary conditions is irrelevant. As Judge Clarke's F&R makes clear, "severe drought conditions were not an excuse for Reclamation to abandon its ESA obligations to the suckers in Upper Klamath Lake and instead allocate water for Klamath Project irrigators." F&R 39.

  Finally, Reclamation notes that the 2022 TOP increased the irrigation allocation from 36,000 acre feet to 62,000 acre feet—not from zero to 62,000 acre feet as the Tribes alleged. Def.'s Obj. 23. Because diversion of *any* water for irrigation purposes constituted an unreasonable decision outside the scope of "corrective actions" under Term 1c of the Biological Opinion, such a distinction is relevant only insofar as to the *degree* to which Reclamation violated the ESA. It does nothing to obviate Reclamation's underlying Section 7 violation of the ESA. The bottom line is that Reclamation's ESA obligations required it to take all steps necessary to avoid jeopardizing the suckers, even if that meant allocating no water to Project irrigators.

  Judge Clarke correctly found that Reclamation must meet ESA requirements before it may fulfill irrigation obligations and that the agency was required to forgo irrigation diversions in order to maintain the Upper Klamath Lake as close as possible to the boundary conditions.

## V.     Violation of Section 9 the ESA

Defendants also object to Judge Clarke's finding that Reclamation violated Section 9 of the ESA. Defendants argue that the Tribes did not offer evidence of any actual harm and, if any harm occurred, the agency was protected by the safe harbor clause of the 2020 Biological Opinion and Incidental Take Statement. Def.'s Obj. 20; Def.-Int's Obj. 17. Whether Reclamation's actions constituted an actual "taking" under Section 9 of the ESA is a distinct inquiry from whether the agency's actions "may affect" a species or its critical habitat under Section 7. *Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 703 (1995) ("Section 7 imposes a broad, affirmative duty to avoid adverse habitat modifications that [Section] 9 does not replicate"). The Court holds that Reclamation committed an unpermitted "take" under Section 9 of the ESA.

Section 9 of the ESA prohibits any take of a listed species. 16 U.S.C. § 1538(a)(1)(B). Take means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, or collect, or to attempt to engage in any conduct." 16 U.S.C. § 1532(19); *Ctr. For Biological Diversity v. Bernhardt*, 982 F.3d 723, 748 (9th Cir. 2020). Such acts include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R § 17.3. An activity may constitute harm even though the harm is "indirect and prospective." *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife, BLM*, 273 F.3d 1229 (9th Cir. 2001). If a consulting agency determines that a proposed action is not likely to jeopardize the continued existence of a listed species, but the action is nonetheless reasonably certain to result in a take of some listed species, the consulting agency may issue an Incidental Take Statement. 16 U.S.C. §1536(b)(4); 50 C.F.R. §

40214(g)(7). The Incidental Take Statement functions as a safe harbor provision immunizing persons from Section 9 liability.

Here, the administrative record clearly indicates that Reclamation's operation of the Project pursuant to the 2022 TOP harmed the suckers' spawning behavior. The 2023 Biological Opinion stated that "impacts to embryos and pre-swum-up larvae are expected to increase as surface elevations in Upper Klamath Lake go below 4,142.00 [feet] during April and May." F&R 44. It also stated plainly that "[w]hen lake elevation is below 4,140.8 [feet,] … larvae [are] more vulnerable to starvation, predation, and entrainment." *Id.* Thus, even if it is difficult to determine the exact number of suckers taken, the science in the administrative record compels the conclusion that a take occurred. "The Tribes need not literally bring a dead fish before this Court to show that Reclamation's operation of the Klamath Project under the 2022 TOP has harmed the suckers." *Id.*

Reclamation also forfeited the protection of the safe harbor provision in the Incidental Take Statement. Term 1c of the Incidental Take Statement required Reclamation to monitor Upper Klamath Lake elevations for boundary conditions and, if necessary, consult with FWS to "adaptively manage and take corrective actions." F&R 43. However, the diversion of water to Project irrigators under the 2022 TOP cannot reasonably be characterized as a "corrective action."

## VI.    Violation of NEPA

Reclamation finally objects to Judge Clarke's findings regarding the Tribes' NEPA claims, arguing that the agency took the requisite "hard look." Def.'s Obj. 24. Reclamation's argument is without merit.

NEPA is a procedural statute. It "does not mandate particular results, but simply prescribed the necessary process" and merely prohibits "uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–351 (1989). The purpose of NEPA is to ensure that the agency has taken a "hard look" at the potential consequences of the proposed action. *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001). An aspect of NEPA is the requirement to analyze the cumulative effects of agency actions, which "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.1(g)(3); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002).

A Determination of NEPA Adequacy ("DNA") is "not a NEPA document" and if "an agency determines that new information is significant, it must prepare a supplemental EA [Environmental Assessment] or EIS [Environmental Impact Statement]." *N. Alaska Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1082 n.3 (9th Cir. 2020). Courts apply a "rule of reason" standard when reviewing the adequacy of a NEPA document to determine if it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001).

In the instant case, the cumulative effects that three years of unprecedent drought would have on boundary levels in the Upper Klamath Lake (and by extension the C'waam and Koptu) were not adequately analyzed in the existing NEPA documents—the Environmental Assessment and Supplemental Environmental Assessment. The exceptional climatic conditions are exactly the type of "new" and "significant" information warranting additional NEPA analysis from the agency. As the F&R observes, the DNA's reliance on "vague" and "conclusory" analysis is

"insufficient to satisfy NEPA's requirements." F&R 50 (quoting *Bark v. U.S. Forest Serv.*, 959 F.3d 865, 872 (9th Cir. 2020)). An agency may not use a DNA to sidestep its obligation to take a "hard look" at the potential impacts of its actions.

## VII.    Conclusion

The Court finds that the Tribes are entitled to summary judgment on all three claims. Magistrate Judge Clarke's Findings and Recommendation (ECF No. 58) is adopted in full. Plaintiff's motion for summary judgment (ECF No. 24) is GRANTED. Defendant Reclamation's motion for summary judgment (ECF No. 32) and Defendant-Intervenor KWUA's motion for summary judgment (ECF No. 29) are DENIED.

IT IS SO ORDERED.

DATED this 7th day of February, 2024.

        _s/Michael J. McShane_____
               Michael McShane
           United States District Judge